UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JEROME ANDERSON,

               Plaintiff,

– against –

FRANK NOWICKI, CHAD DUNNING,
BRIAN GREENING, ROBERT BECK,
ANTHONY RODRIGUEZ, FNU MCGRAIN,
JOSHUA BURCH, KRISTOPHER BURCH,
and JOHN DOES #1-5,

               Defendants.

Case No. 23-CV-397

**COMPLAINT**

JURY TRIAL DEMANDED

DAVID B. SHANIES LAW OFFICE PLLC

David B. Shanies
Deborah I. Francois [*admission forthcoming*]
Tristan M. Ellis [*admission forthcoming*]
110 West 40th Street, 10th Floor
New York, New York 10018
(212) 951-1710
*david@shanieslaw.com*
*deborah@shanieslaw.com*
*tristan@shanieslaw.com*

1. This is a civil rights action brought by Plaintiff Jerome Anderson to seek relief under the Civil Rights Act of 1871, 42 U.S.C. § 1983, for Defendants' violations of Mr. Anderson's rights secured by the First, Eighth, and Fourteenth Amendments to the U.S. Constitution, and under state law for Defendants' violations of Mr. Anderson's rights secured by the common law of the State of New York.  Mr. Anderson seeks compensatory and punitive damages and such other relief as this Court deems equitable and just.

## INTRODUCTION

2. On May 4, 2022, Defendants Chad Dunning, Brian Greening, and Joshua or Kristopher Burch (collectively, the "Assault Defendants"), unprovoked and without justification, violently assaulted Plaintiff Jerome Anderson in his cell at Attica Correctional Facility ("Attica" or the "Facility"), causing him physical injuries and significant pain and suffering (the "May 4th Assault").

3. The Assault Defendants targeted Mr. Anderson because they had recently discovered that he had previously won a lawsuit against Department of Corrections and Community Supervision ("DOCCS") officers for their use of excessive force against him.  The Assault Defendants assaulted Mr. Anderson to send him the message that he could not rely on the legal system to protect him; that the corrections officers were in charge of the Facility and could do as they please; and that Mr. Anderson would be physically harmed if he were to sue corrections officers at Attica.

4. Rather than provide Mr. Anderson redress and hold the Assault Defendants accountable, Defendant Frank Nowicki instead protected them by fabricating charges against Mr. Anderson falsely alleging, in sum, that Mr. Anderson assaulted Defendant Greening and was in possession of a makeshift weapon.

5. Defendant Nowicki falsely claimed he saw Mr. Anderson assault Defendant Greening when, in fact, Defendant Nowicki did not witness any of the violence that transpired in Mr. Anderson's cell because Defendant Nowicki neglected his responsibilities as sergeant to supervise his subordinate officers' searches of incarcerated individuals' cells.

6. Defendants Robert Beck, Anthony Rodriguez, and FNU McGrain denied Mr. Anderson his right to due process by relying on Defendant Nowicki's obviously fabricated evidence and false testimony during disciplinary hearings against Mr. Anderson.

7. As a result of those false charges and the resulting sham disciplinary hearings, for which Mr. Anderson was denied due process, Mr. Anderson was found guilty and punished with 270 days of solitary confinement, loss of privileges (including, *inter alia*, access to the commissary, access to a phone, and the ability to receive packages), and a loss of six months of "good time" credit.

8. After a second hearing and several rounds of appeals, DOCCS officials ultimately vacated and expunged Mr. Anderson's disciplinary conviction, but only after Mr. Anderson had already endured the worst of his unwarranted punishment—*i.e.*, nine months of solitary confinement and loss of privileges.

9. Decades of scientific research and scholarship have demonstrated that solitary confinement can cause extreme psychological injuries.

10. Through this action, Mr. Anderson seeks justice for both the May 4th Assault and the fabrication of evidence and denial of due process that caused him to spend nine months in solitary confinement with a loss of privileges.

**JURISDICTION AND VENUE**

11. This action is brought under 42 U.S.C. §§ 1983 and 1988, and New York State law. Mr. Anderson alleges that he was deprived under color of law of his rights under the First, Eighth,

and Fourteenth Amendments to the U.S. Constitution because of the retaliatory assault, the fabrication of evidence, and the denial of the process to which he was due before being deprived of a liberty interest.

12. This Court has original subject matter jurisdiction over Mr. Anderson's federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343, this being an action seeking redress for the violation of Mr. Anderson's constitutional rights.

13. This Court has supplemental jurisdiction over Mr. Anderson's state law claims pursuant to 28 U.S.C. § 1367(a) because Mr. Anderson's state law claims arise from the same case or controversy as Mr. Anderson's federal claims.

14. Venue is proper in the United States District Court for the Western District of New York pursuant to 28 U.S.C. § 1391 because Mr. Anderson's claims arose in this District.

## **PARTIES**

15. Plaintiff Jerome Anderson is a person currently incarcerated at Five Points Correctional Facility and previously incarcerated at Attica during the events giving rise to this action.

16. Defendants Chad Dunning, Brian Greening, and Joshua or Kristopher Burch were, at all times relevant to this action, employees and Correctional Emergency Response Team officers at Attica. At all relevant times, they acted toward Mr. Anderson under color of law and within the scope of their employment. This lawsuit seeks to hold Defendants Burch, Dunning, and Greening liable in their individual capacities.

17. Defendant Frank Nowicki was, at all times relevant to this action, a sergeant and employee at Attica who had supervisory responsibilities, including a responsibility to supervise searches of incarcerated individuals' cells. At all relevant times, he acted toward Mr. Anderson

under color of law and within the scope of his employment. This lawsuit seeks to hold Defendant Nowicki liable in his individual capacity.

18. Defendants Robert Beck, Anthony Rodriguez, and FNU McGrain were, at all times relevant to this action, employees of DOCCS who served as disciplinary hearing officers. Defendant McGrain held the rank of Captain. At all relevant times, they acted toward Mr. Anderson under color of law and within the scope of their employment. This lawsuit seeks to hold Defendants Beck, Rodriguez, and McGrain liable in their individual capacities.

19. Defendants John Does #1-5 were, at all times relevant to this action, employees at Attica or DOCCS who acted toward Mr. Anderson under color of law and within the scope of their employment; and who participated in the misconduct alleged herein; but whose actual names Mr. Anderson has been unable to ascertain notwithstanding reasonable efforts to do so. This lawsuit seeks to hold Defendants John Does #1-5 liable in their individual capacities.

## JURY DEMAND

20. Mr. Anderson hereby demands trial by jury of all issues raised in this complaint.

## STATEMENT OF FACTS

**I.    Plaintiff's Prior Successful Lawsuit and Damages Award**

21. In April of 2015, Mr. Anderson was assaulted by corrections officers while incarcerated at Green Haven Correctional Facility.

22. Mr. Anderson filed a lawsuit to seek redress for his assault, *Anderson v. Osborne, et al.*, Case No. 7:17-CV-539 (VB) (AEK) (S.D.N.Y.), (the "Green Haven Lawsuit").

23. On February 24, 2020, following a jury trial, the court entered judgment for Mr. Anderson, awarding him $650,000 in compensatory and punitive damages.

4

24. Thereafter, Mr. Anderson kept in his cell a copy of a newspaper article covering and discussing Mr. Anderson's successful lawsuit, as well as a letter Mr. Anderson had written to several media outlets.

### II. The April 30, 2022, Search

25. In April of 2022, Mr. Anderson was incarcerated at Attica.

26. On April 30, 2022, Attica was locked down for a facility-wide search.

27. Although many surveillance cameras monitor the Facility, there are no cameras from which one can see the inside of an incarcerated individual's cell.

28. Two corrections officers, John Doe #1 (believed to wear badge number 37996) and John Doe #2, searched Mr. Anderson's cell, number 25-19.

29. Mr. Anderson had no contraband in his cell.

30. John Doe #1 conducted the search while John Doe #2 perused Mr. Anderson's belongings, including the newspaper article related to the Green Haven Lawsuit and the letter to the media that Mr. Anderson had written.

31. John Doe #2 showed the documents to John Doe #1.

32. After reading these documents, both corrections officers began to search Mr. Anderson's cell more intensely.

33. Among the items the corrections officers found were obituaries of Mr. Anderson's family members who passed away while he was incarcerated.

34. It is standard procedure for the water to be turned off during facility-wide searches at Attica.

35. During the April 30th search, the water was turned off in Mr. Anderson's cell, per Facility policy.

36. As a result of the policy requiring water to be turned off during Facility searches, Mr. Anderson's toilet contained waste during the time of the search.

37. John Doe #2 discarded Mr. Anderson's obituaries into the toilet in Mr. Anderson's cell. As a result, the obituaries were soiled with human waste.

38. One of the corrections officers conducting the search of Mr. Anderson's cell took with him both the newspaper article about the Green Haven Lawsuit and Mr. Anderson's letter to the media.

**III.   The May 4, 2022, Search and Assault**

39. On May 4, 2022, Attica was locked down for another facility-wide search (the "May 4th Search").

40. It is uncommon for a facility-wide search to take place only a few days after a previous search.

41. The May 4th Search targeted only selected incarcerated individuals' cells.

42. The purpose of the May 4th Search was to allow corrections officers to retaliate against and assault incarcerated individuals they perceived as "troublemakers" who may upset the status quo of the Facility, *e.g.*, by bringing a lawsuit to hold corrections officers accountable for inhumane treatment, or for "talking back" to corrections officers.

43. As Mr. Anderson waited for corrections officers to come and search his cell, he noticed three or four incarcerated individuals pass by who were clearly injured and being escorted to the infirmary.

44. Mr. Anderson recognized at least one of the injured men as someone who previously filed a lawsuit against DOCCS and/or one or more corrections officers.

45. The Facility corrections officers performing the "search" thought the incarcerated individuals they assaulted on May 4th needed to be "taught a lesson."

46. Curious to see what was happening, Mr. Anderson stuck a mirror out between the bars of his cell, angling it so that he could see further down the cell block.

47. While Mr. Anderson was surveying the area with his mirror, he noticed that there were no supervisors present during the search.

48. DOCCS policy requires a supervisor to be present during a facility-wide search. *See* DOCCS Directive #4910.

49. When it was time for Mr. Anderson's cell to be searched, the Assault Defendants—on information and belief, with the aid or acquiescence of one or more of Defendants John Does #1-5—rushed into the cell and told Mr. Anderson to back up.

50. As Mr. Anderson complied, Defendant Greening punched Mr. Anderson in the face, causing Mr. Anderson to temporarily lose consciousness.

51. Mr. Anderson regained consciousness as the Assault Defendants—on information and belief, with the aid or acquiescence of one or more of Defendants John Does #1-5—*inter alia*, punched, kicked, and elbowed him.

52. At that point, Defendant Greening took the newspaper article that had been recovered from Mr. Anderson's cell on April 30th and forcibly shoved it into Mr. Anderson's mouth.

53. As he did so, Defendant Greening threateningly asked Mr. Anderson, in sum and substance, "Where's your fucking lawyer now?"

54. A staple attached to the newspaper article cut Mr. Anderson's gums as Defendant Greening shoved it into Mr. Anderson's mouth.

55. John Doe #1 or #2, who had been present for the April 30th search, was also present for the May 4th Search and told Mr. Anderson, in sum and substance, "I told you we'd be back."

56. At no point during the encounter did any of the corrections officers intervene to prevent, mitigate, or stop the abuse, despite having an affirmative duty and opportunity to do so.

57. Mr. Anderson in no way resisted the corrections officers' use of force.

58. During the May 4th Assault, the corrections officers yelled for Mr. Anderson to stop resisting, even though he was not, with the apparent intention that their statements would be picked up by the audio of the Facility's cameras and provide the officers with a fabricated justification for using force.

59. Mr. Anderson yelled that he was not resisting.

60. Mr. Anderson made no threats, physical or verbal, to the corrections officers.

61. There were no circumstances justifying any use of force during the search of Mr. Anderson's prison cell.

62. For instance, Mr. Anderson did not attempt to escape from his cell, assume a fighting stance, or lunge for a weapon when the corrections officers began to attack him.

63. Mr. Anderson was instead targeted for violence only because of his previous lawsuit.

64. After being violently assaulted, Mr. Anderson was handcuffed and taken to the infirmary to have some of his injuries treated.

65. The medical staff responsible for photographically documenting Mr. Anderson's injuries took photographs that sought to minimize the extent of Mr. Anderson's injuries by taking only two close-up photographs of Mr. Anderson's face.

66. Mr. Anderson's documented injuries consisted of a half-inch abrasion on his right temple and a "grape-sized raised area" on his left eyebrow.

67. Mr. Anderson received minor medical treatment incongruous to the serious degree of his injuries, namely, the application of bacitracin ointment and a Band-Aid.

68. When his handcuffs were removed and he was placed into isolation, Mr. Anderson was better able to survey the additional—and clearly visible—injuries he suffered that were not documented during his trip to the infirmary, including, *inter alia*: a deep purple mark on his left thigh that was painful to the touch; deep purple bruises on the inside of his left knee, making it feel as though his knee were broken; injury marks on his left ankle; a swollen left elbow, preventing him from being able to fully extend his left arm; and a severe laceration on his bottom left gums from the staple attached to the newspaper article that was shoved into his mouth—a laceration that, because it went untreated, appeared to become infected.

69. Subsequently, on or about May 6, 2022, Mr. Anderson complained to Dr. Williams, a doctor employed at Attica, who took note of these further injuries.

70. Mr. Anderson tried to seek treatment for these further, undocumented injuries, but was denied the opportunity to do so.

71. On information and belief, Mr. Anderson's additional injuries were never officially documented.

72. On information and belief, Mr. Anderson's additional injuries were deliberately ignored in an attempt to minimize evidence of the injuries the Assault Defendants inflicted on Mr. Anderson.

73. Mr. Anderson received no further medical treatment for his injuries, aside from the bacitracin ointment and Band-Aid that were applied on May 4th.

74. Mr. Anderson never received any treatment, for example, for the laceration on his gums due to Defendant Greening's shoving a newspaper article into Mr. Anderson's mouth.

## IV. Sham Disciplinary Proceedings and Punishment

75. Later on May 4, 2022, Mr. Anderson received a misbehavior report, falsely alleging that Mr. Anderson assaulted Defendant Greening and possessed a makeshift weapon.

76. In the falsified report, Defendant Nowicki claimed to have supervised the May 4th Search and witnessed Mr. Anderson's alleged assault of Defendant Greening.

77. Neither Defendant Nowicki nor any other supervisor was present during the May 4th Search.

78. The falsified misbehavior report alleged Tier III violations, the highest level of violations that can be committed by an incarcerated individual.

79. During his decades of incarceration, Mr. Anderson has never assaulted, or attempted to assault, a corrections officer.

80. As a result of Defendant Nowicki's falsified misbehavior report, Mr. Anderson was punished with 270 days in the Special Housing Unit ("SHU" or solitary confinement), a loss of privileges, and a loss of six months of "good time" credit.

81. Mr. Anderson began his term of confinement in SHU immediately after the May 4th Assault.

82. Mr. Anderson served the first approximately two months of his solitary confinement punishment while at Attica, from which he was transferred in July of 2022.

83. During that time, he was kept in his prison cell for twenty-one to twenty-two hours a day, allowed two to three hours of outdoor time in an individual cage, and permitted only three showers per week.

84. The showers available to incarcerated individuals in SHU at Attica are not maintained and are unsanitary.

85. Mr. Anderson served the remainder of his solitary confinement punishment at Five Points Correctional Facility. During this portion of his unwarranted punishment, Mr. Anderson's conditions of confinement were materially the same as his conditions of confinement in SHU at Attica.

   A.   *First Hearing*

86. On May 23, 2022, Mr. Anderson appeared for a disciplinary hearing to face the charges in Defendant Nowicki's falsified misbehavior report.

87. Defendant Beck presided over the May 23rd hearing.

88. During the hearing, in order to protect the Assault Defendants, Defendant Nowicki falsely testified, in sum and substance, that:

   a. He was on the gallery supervising the May 4th Search;

   b. He ran to Mr. Anderson's cell when he heard a commotion emanating from it; and

   c. He witnessed Mr. Anderson elbow Defendant Greening.

89. Although the individual prison cells at Attica do not have surveillance cameras, most of the rest of the Facility is equipped with cameras.

90. Surveillance cameras captured video of the gallery area of the Facility on which Defendant Nowicki claimed to be positioned during the May 4th Search.

91. Defendant Beck did not allow Mr. Anderson to view this video footage during the May 23rd hearing, even though the footage would have conclusively shown that Defendant Nowicki had presented false testimony and was not, in fact, present for the May 4th Search.

92. Defendant Beck relied exclusively on Nowicki's false testimony to find Mr. Anderson guilty of the charges in the falsified misbehavior report.

93. On July 7, 2022, Defendant Rodriguez reviewed and modified the results of the May 23, 2022, hearing, dismissing one of the charges against Mr. Anderson, but leaving the prescribed punishment in place.

94. Defendant Rodriguez initially otherwise affirmed Defendant Beck's determination.

95. Following Mr. Anderson's request for reconsideration, Defendant Rodriguez ordered a second hearing on October 18, 2022.

### B. *Second Hearing*

96. During a second hearing, which concluded on October 31, 2022, the hearing officer, Defendant McGrain, permitted Mr. Anderson to view the video footage that Defendant Beck refused to allow him to review during the first, May 23rd, hearing.

97. The video footage confirmed that neither Defendant Nowicki nor any other supervisor oversaw the May 4th Search, establishing that Defendant Nowicki had fabricated the key evidence on which Mr. Anderson's conviction relied.

98. Nevertheless, and despite the obvious falsity of Defendant Nowicki's testimony, Defendant McGrain again found Mr. Anderson guilty of the charges in the falsified misbehavior report.

99. Mr. Anderson's punishment—270 days in SHU, a loss of privileges, and a loss of six months of "good time" credit—remained in place.

### C. *Vacatur and Expungement of False Violation*

100. After Mr. Anderson made another request for reconsideration, on March 17, 2023, Defendant Rodriguez vacated and expunged Mr. Anderson's violation conviction.

101. Although the sham allegations regarding the May 4th Assault have been expunged from Mr. Anderson's disciplinary record, he nevertheless suffered a loss of a liberty interest by being placed in solitary confinement and being denied privileges for 270 days.

## DAMAGES

102. The May 4th Assault and the acts and omissions of Defendants Burch, Dunning, Greening, and John Does #1-5 directly and proximately caused Mr. Anderson's physical injuries, including significant abrasions, bleeding, bruising, swelling, scarring, oral lacerations, and pain; and Mr. Anderson's mental, emotional, and psychological suffering, including anxiety, sleep disorders, depression, post-traumatic stress, mental distress, shock, fright, and humiliation.

103. The sham allegations and denial of due process and the acts of omissions of Defendants Nowicki, Beck, Rodriguez, McGrain directly and proximately caused Mr. Anderson to suffer a loss of a liberty interest—namely, nine months in solitary confinement—and, as a result, mental, emotional, and psychological suffering, including anxiety, sleep disorders, depression, post-traumatic stress, mental distress, shock, fright, and humiliation.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983

*Excessive Force*
*(U.S. Constitution Amendments VIII and XIV)*

**Against Defendants Burch, Dunning, Greening, and John Does #1-5**

104. Mr. Anderson repeats and realleges by reference all the allegations in the preceding paragraphs.

105. The Assault Defendants and Defendants John Does #1-5 inflicted unnecessary and wanton harm on Mr. Anderson by viciously attacking him in his prison cell.

13

106. No use of force was necessary during the May 4th Search, making all the force the Assault Defendants and Defendants John Does #1-5 used excessive.

107. The force used against Mr. Anderson served no valid safety or penological purpose.

108. The Assault Defendants and Defendants John Does #1-5s' only purpose in attacking Mr. Anderson was to cause harm maliciously and sadistically.

109. The Assault Defendants and Defendants John Does #1-5 knew of, assisted, failed to intervene to prevent, were deliberately indifferent to, and in all respects acquiesced to the other officers' actions described herein.

110. The Assault Defendants and Defendants John Does #1-5 disregarded their legal duty to intervene to prevent, mitigate, and/or stop the other officers' use of excessive force on Mr. Anderson.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983

*First Amendment Retaliation*
*(U.S. Constitution Amendments I and XIV)*

**Against Defendants Burch, Dunning, Greening, and John Does #1-5**

111. Mr. Anderson repeats and realleges by reference all the allegations in the preceding paragraphs.

112. By filing the Green Haven Lawsuit, Mr. Anderson engaged in speech protected by the First Amendment.

113. The Assault Defendants and Defendants John Does #1-5 attacked Mr. Anderson because he had filed and won the Green Haven Lawsuit.

114. Had Mr. Anderson not filed the Green Haven Lawsuit, the May 4th Assault would not have taken place.

115. The Assault Defendants and Defendants John Does #1-5 attempted to deter Mr. Anderson from filing subsequent lawsuits, such as this one, by sending Mr. Anderson the message that he would be further harmed if he were to pursue another lawsuit.

116. Physical assault is conduct that is likely to deter First Amendment activity.

## THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983

*Fabrication of Evidence and Denial of Due Process*
*(U.S. Constitution Amendment XIV)*

**Against Defendants Nowicki, Beck, Rodriguez, and McGrain**

117. Mr. Anderson repeats and realleges by reference all the allegations in the preceding paragraphs.

118. Defendant Nowicki fabricated evidence by preparing a falsified misbehavior report and providing false testimony on which Mr. Anderson's punishment was predicated.

119. Defendants Beck, Rodriguez, McGrain facilitated Defendant Nowicki's fabrication of evidence by relying on it despite its obvious falsity.

120. The fabrication of evidence and reliance on obviously false testimony denied Mr. Anderson the process to which he was due.

121. As a direct and proximate result of Defendants Nowicki, Beck, Rodriguez, and McGrain's unlawful conduct, Mr. Anderson was deprived of liberty interests, namely, by being placed in solitary confinement for 270 days with a loss of privileges.

## FOURTH CAUSE OF ACTION

### Assault

*New York State Law*

### Against Defendants Burch, Dunning, Greening, and John Does #1-5

122. Mr. Anderson repeats and realleges by reference all the allegations in the preceding paragraphs.

123. Through their conduct and words, the Assault Defendants and Defendants John Does #1-5 intentionally placed Mr. Anderson in imminent apprehension of harmful or offensive physical contact.

124. Mr. Anderson did not consent to the Assault Defendants and Defendants John Does #1-5s' conduct.

125. The Assault Defendants and Defendants John Does #1-5s' conduct and words were performed intentionally, recklessly, and/or with deliberate indifference to Mr. Anderson's rights and physical safety.

## FIFTH CAUSE OF ACTION

### Battery

*New York State Law*

### Against Defendants Burch, Dunning, Greening, and John Does #1-5

126. Mr. Anderson repeats and realleges by reference all the allegations in the preceding paragraphs.

127. Through their conduct, the Assault Defendants and Defendants John Does #1-5 intentionally made offensive physical contact with Mr. Anderson.

128. Mr. Anderson did not consent to the Assault Defendants and Defendants John Does #1-5s' conduct.

129. The Assault Defendants and Defendants John Does #1-5s' conduct was performed intentionally, recklessly, and/or with deliberate indifference to Mr. Anderson's rights and physical safety.

## SIXTH CAUSE OF ACTION

### Negligent Supervision

*New York State Law*

### Against Defendant Nowicki

130. Mr. Anderson repeats and realleges by reference all the allegations in the preceding paragraphs.

131. Defendant Nowicki was responsible for supervising the May 4th Search and had a duty to do so.

132. Defendant Nowicki breached his duty by abdicating his supervisory role and failing to supervise the May 4th Search.

133. Had Defendant Nowicki met his duty to supervise, he could have interceded and prevented the Assault Defendants and Defendants John Does #1-5s' vicious attack on Mr. Anderson.

134. Defendant Nowicki's failure to supervise the Assault Defendants and Defendants John Does #1-5, and thus inability to intercede, proximately caused Mr. Anderson's physical injuries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jerome Anderson demands judgment against the above-captioned Defendants as follows:

  a. For compensatory damages to be determined at trial;

  b. For punitive damages in an amount to be determined at trial;

   c. For reasonable attorneys' fees, costs, and disbursements, pursuant to 42 U.S.C. § 1988 and other applicable laws;

   d. For pre- and post-judgment interest as allowed by law; and

   e. For such other relief as this Court deems just and proper.

Dated: May 4, 2023
New York, New York

DAVID B. SHANIES LAW OFFICE PLLC

*/s/ David B. Shanies*

David B. Shanies
Deborah I. Francois [*admission forthcoming*]
Tristan M. Ellis [*admission forthcoming*]
110 West 40th Street, 10th Floor
New York, New York 10018
(212) 951-1710
*david@shanieslaw.com*
*deborah@shanieslaw.com*
*tristan@shanieslaw.com*

*Attorneys for Plaintiff Jerome Anderson*

18